**Harvey Don CHRISTIAN, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 57339.**

Court of Criminal Appeals of Texas, En Banc.

Jan. 23, 1980.

Billy H. Vannatta, court appointed, Waco, for appellant.

Felipe Reyna, Dist. Atty. and Karen R. Cable, Asst. Crim. Dist. Atty., Waco, Robert Huttash, State's Atty., Austin, for the State.

## OPINION ON APPELLANT'S MOTION FOR REHEARING

CLINTON, Judge.

On original submission a panel opinion affirmed judgment of conviction after overruling, *inter alia*, a ground of error in which appellant complained that the trial court denied his motion to suppress evidence obtained, he asserted, through an illegal search and seizure. The panel viewed his complaint as focusing on what is called a "flashlight search" of the front interior of his automobile, and held that, having stopped appellant for a traffic violation, the two officers were entitled to observe anything within plain view, so that when one of the officers spotted a "rifle" in the vehicle they gained "probable cause" to frisk appellant, and the switchblade knife produced by the frisk gave rise to more "probable cause" for a full search of the person, turning up a twopenny matchbox, and of the vehicle of appellant, revealing the other materials described by the panel opinion. Because appellant insists that the officer with the flashlight did not see a "rifle" and that examination of the contents of a small matchbox cannot reasonably be considered a search for weapons, we granted leave to file a motion for rehearing to ascertain just what Officer Flores did and initially saw in order to determine whether the facts and law justified the searches that followed.

First, let us reset the scene. At approximately 8:30 p. m. on the evening of April 23, 1976, the officers were vehicularly patrolling East Waco Drive in the City of Waco. Another motor vehicle, later determined to be driven by appellant, passed them as both were heading east on that major thoroughfare, at a speed that exceeded the posted forty mile an hour limit. Signalling first with horn honks and then with dimming lights, the officers stopped appellant shortly after he crossed over a

bridge.[1] Appellant got out of his car; the officers got out of their unit; as they approached each other, at the instance of Officer Flores, Reserve Officer Sullins asked appellant to step over behind his vehicle to an area away from traffic and produce his driver's license, which he did. Meanwhile, in the words of Officer Flores in response to questions by the State:

". . . At this time, I went—it was dark, so I had my flashlight, and I shined my light inside Mr. Christian's car.[2] This is also *general procedure. Sometimes* we do it for our safety, to see if anybody else is there *or what.*"[3]

Q: Okay. When you shined the light into the car, did you notice anything?

A: Yes, sir. I noticed what appeared to me to be a rifle or shotgun butt, or a stock.

Q: Okay. The stock end of a rifle or shotgun?[4]

A: That is correct.

Q: Okay. At that time, what did you do?

A: Okay. I then, of course, immediately told Reserve Officer Sullins to pat-down Mr. Christian—pat him down. And we both patted him down for weapons."[5]

Explaining that he was working on the right side of appellant while Sullins searched his left, Flores saw Sullins remove from appellant's left hand pocket a small matchbox that, upon examination, contained plastic wrapping of "some type of powdery white substance."[6]

■ In its brief the proposition advanced by the State is that "if officers see the commission of an offense while making a traffic stop the officers may make the necessary arrests and searches. (Citing three cases which present somewhat different theories, as we point out in the margin.)[7]

1. At no time during their pursuit of the vehicle did either officer suggest a passenger was observed with appellant.

2. On cross examination Officer Flores elaborated that he "didn't bother" to open the driver's door but just looked through the window glass.

3. All emphasis is supplied throughout by the writer of this opinion unless otherwise indicated.

4. Later search of the vehicle produced from the front seat floorboard area an otherwise unremarkable .12 gauge pump shotgun, loaded with six shells.

5. Officer Flores acknowledged that from the moment appellant reached the curb area behind his car, after voluntarily getting out of it and approaching the officers emptyhanded, he "wasn't anywhere within reach of that car, where he could have gotten that shotgun."

6. From viewing the substance Flores conceded that they did not know what it was, it could have been powdered sugar "or anything." Moreover, as he pursued appellant on foot across Interstate Highway 35 Sullins dropped the matchbox and never saw it again until the day he testified as a witness in the trial.

7. *Attwood v. State*, 509 S.W.2d 342 (Tex.Cr. App.1974) is a *Taylor* doctrine type case, *Taylor v. State*, 421 S.W.2d 403 (Tex.Cr.App.1967), in which an officer stopped an automobile, informed its driver that the license plate had expired and issued a ticket for that violation; during the course of questioning the driver concerning ownership of the vehicle another officer detected a strong odor of marihuana emitting from the car, obtained a key to and opened its trunk and discovered a load of marihuana. Under *Taylor*, the trunkload was held admissible.

In *Hampton v. State*, 511 S.W.2d 1 (Tex.Cr. App.1974) the officer, who was found to have stopped a "suspicious" car containing a driver and two passengers for a traffic violation, went to the driver's side and requested all occupants to produce licenses; in the course of this activity the officer noticed the butt of a pistol sticking out from under the arm rest in the middle of the front seat; he promptly ordered all out of the car. Another officer announced to Hampton, one of the passengers, that he was going to search the car "because we think there might be a weapon in there," and, upon being asked whether the officer would find anything, appellant said he would and where. The ensuing search produced the pistol from under the arm rest and a sawed off shotgun from under the front seat. The Court, with some expressed uncertainty, opted to apply the "plain view" doctrine to the observation of the pistol on the front seat, and its excerpt from *Casarez v. State*, 504 S.W.2d 847, 849 (Tex.Cr.App. 1974) makes clear as does *Casarez* itself, that "plain view" negates a "search" concept and, therefore, is different from the search incident to arrest exception. See also *Holman v. State*, 474 S.W.2d 247, 248 (Tex.Cr.App.1972).

*Borner v. State*, 521 S.W.2d 852 (Tex.Cr.App. 1975) involves joint possession of marihuana

This is the factual situation present in this case." The "offense" to which the State alludes is the presence of the sighted butt of a shotgun in the front floorboard area, but the State fails to direct us to any statute proscribing possession of the butt of, or all of, an otherwise ordinary shotgun in a motor vehicle.

Weapons which generally may not be carried lawfully under V.T.C.A. Penal Code, § 46.02(a) are handguns, illegal knives and clubs. Here what turned out to be a shotgun is not, the State conceded in open court, an illegal weapon. Hence its presence in appellant's car did not constitute a penal offense.[8] That Flores knew of appellant's prior burglary convictions is not suggested. The *Taylor* doctrine did not become operative in these circumstances.

The simplistic analysis made in the panel opinion is also wide the mark, and not supported by citation of authority other than *Dillard v. State*, 550 S.W.2d 45 (Tex.Cr.App. 1977), and *Long v. State*, 532 S.W.2d 591 (Tex.Cr.App.1976), for the notion that officers, having made a stop for a traffic violation, are "entitled to observe anything within in plain view."[9] From that generalized position, however, the panel opinion then takes a mighty long leap to derive from the mere observation of the shotgun butt "probable cause to frisk," and, the opinion says, "Because the observation of the rifle [sic] was legal, all subsequent searches were proper." The leap, we believe, covers too much unexplored territory in between. More like hopscotch, let us take it one small jump at a time.

▇▇▇ In the first place, until the frisk or search of his person the sole offense attributed to appellant was speeding. Pursuant to settled constructions of Article 6701d,

---

by a speeding driver and his passenger who was observed making concealing movements before their car was stopped by pursuing officers. The driver, Borner, got out and approached one officer; the passenger, Ebeling, remained in the car until the other officer opened that door and asked him to get out. When the second officer then looked to see what the passenger had been handling he found a pistol in a small place by the arm rest; in extracting the pistol moments later he saw in an open ashtray what appeared to be a marihuana cigarette and emitted the distinctive odor of one. The Court explained that the search of the area where the occupants were seated was for the protection of the officers, justified by the movements of Ebeling prior to the stop. In quoting from and emphasizing an excerpt from *Wood v. State*, 515 S.W.2d 300 (Tex.Cr.App.1974) the *Borner* opinion demonstrates that it is approving a limited search of weapons upon the articulated reason to believe that Ebeling was armed and, perforce, dangerous.

8. If it were otherwise the gun racks in hundreds of motor vehicles that now proudly display at least one rifle or shotgun would become as bare as the proverbial cupboard.

9. In *Dillard*, supra, the initial stop, like here, was authorized by a speeding violation; the officer asked the driver and his passengers, all of whom remained in the car, for identification and, as he was doing so, observed a long barreled weapon in the rear floorboard. The Court noted that his observation of the shotgun in plain view was not the fruit of a search. But

the point of the observation was that presence of the shotgun linked up prior information concerning a robbery that had just been committed at a nearby motel, and that linkage along with other articulable facts and inferable circumstances warranted a further detention until other investigating officers arrived to ascertain if the occupants of the vehicle fit descriptions of the robbers. Here, however, Officer Flores had absolutely no other information concerning appellant.

*Long*, supra, is even farther afield. Based on reports of unusual aerial activity at a remote section of his county, a sheriff went to the property during daylight hours to make inquiries. In the process of locating someone at the place to talk to, he and his deputy passed by an open window and felt a blast of heat and a strong smell coming through it; looking into the room they saw something covering the floor and stacked around the walls and an electric heater with an electric floor fan behind it in a doorway. Based on those observations and olfactory sensations they sought out a magistrate and obtained a search warrant for the premises. The Court held the sheriff and his deputy had not conducted a search in observing that which was open to view, *id.* at 594–595.

The general statement of the plain view concept quoted in the body above omits qualifying language which usually is included; viz: an officer "who has a right to be in a position to have the view," e. g., *Abbott v. State*, 472 S.W.2d 142 (Tex.Cr.App.1971).

§§ 147 and 148(a),[10] V.A.C.S., "*[e]xcept for the offense of speeding*, an officer may arrest and take into custody one seen committing a traffic offense," *Tores v. State*, 518 S.W.2d 378, 380 (Tex.Cr.App.1975); *Wilson v. State*, 511 S.W.2d 531, 536 (Tex.Cr.App.1974) (Douglas, J., dissenting); *Montgomery v. State*, 145 Tex.Cr.R. 606, 170 S.W.2d 750, 752 (1943); *Spencer v. Southland Life Ins. Co.*, 340 S.W.2d 335, 337 (Tex.Civ.App.—Ft. Worth 1960) error refused; see also *Ciulla v. State*, 434 S.W.2d 948, 950–951[11] (Tex.Civ.App.—Houston (1st) 1968) no writ history. As he was standing by and displaying his license to Sullins appellant was not under custodial arrest, *Thomas v. State*, 572 S.W.2d 507, 509 (Tex.Cr.App.1978) and cf. *Wussow v. State*, 507 S.W.2d 792 (Tex.Cr.App.1974), and thus not then vulnerable to a legally authorized incident search of his person.

Next, from the time he exited his car and closed its door behind him until Officer

10. Appellant is a resident of Waco and his car bore Texas license plates.

11. Citing two cases the *Ciulla* opinion states, "For many years it has been clear, under Texas decisions, that if an officer sees a person violating a traffic law, he is authorized to arrest him *and search his person*." Their genesis is probably *Hawley v. State*, 107 Tex.Cr.R. 243, 296 S.W. 556 (Tex.Cr.App.1927) which, in turn, cited *Agnello v. United States*, 269 U.S. 20, 46 S.Ct. 4, 70 L.Ed. 145 (1925). In light of *United States v. Robinson*, 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973), wherein the Supreme Court reexamined the "dicta" of *Agnello* and "virtually all" prior statements of the Court, 414 U.S. at 230, 94 S.Ct. 467, the arrest that justifies a search incident must now qualify as a "custodial" one: "A *custodial* arrest of a suspect based on probable cause is a reasonable intrusion under the Fourth Amendment; that intrusion being lawful, a search incident to the arrest requires no additional justification. It is the fact of the lawful arrest which establishes the authority to search, and *we hold* that in the case of a *custodial* arrest a full search of the person is not only an exception to warrant requirement of the Fourth Amendment, but is also a "reasonable search under that Amendment," *id.* at 236, 94 S.Ct. at 477. The *Robinson* holding is followed and somewhat explicated in *Gustafson v. Florida*, 414 U.S. 260, 94 S.Ct. 488, 38 L.Ed.2d 456 (1973): "*We hold*, therefore, that *upon* arresting petitioner for the offense of driving his automobile without possession of a valid operator's license, *and taking him into custody*, Smith was entitled to make a

Flores saw the butt of a shotgun,[12] except for speeding, neither officer gave the slightest flicker of indication of even suspicion that appellant had, was or contemplated engaging in criminal conduct. Officer Flores went up to the driver's side of, and shined his flashlight inside, appellant's car according to what he said is "general procedure."[13] The only tangible, material thing that Officer Flores reported seeing was what he is permitted to believe is a shotgun or rifle. He then "immediately turned around and told . . . Sullins to cease questioning, we had to frisk him," explaining in court that he intended "just a search for weapons, that is all."

By its argument and the citation of *Borner*, supra, at note 7, which, in turn, relied heavily on *Wood v. State*, 515 S.W.2d 300 (Tex.Cr.App.1974), which drew from and applied principles of *Adams v. Williams*, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612

full search of petitioner's person incident to that lawful arrest," 414 U.S. at 266, 94 S.Ct. at 492.

12. Subsequently testifying before the jury Officer Flores expanded his observation to include "part of the metal—the cylinder part," "part of the mechanism" and "the trigger part," the latter two *in response to leading questions by* the prosecutor. In any event we assume that Flores inferred he was viewing a long firearm.

13. Later the officer elaborated on application of that procedure in the instant case. Thus:

". . . [W]e, generally, when there is a partner with you, you more or less exchange information as to what you are going to do, and what is your responsibility, because each man has different ideas. And, so I told him, well, you take his drivers [sic] license. * *

. . . We had more or less, like I said, prior to our exiting out of our vehicle, he was going to do that, and I was more or less—general procedure sometimes, is to go and look in the other person's car, and shine your light, because it was dark, and then come back and talk to the man."

Unlike the officers in *Onofre v. State*, 474 S.W.2d 699 (Tex.Cr.App.1972), Officer Flores' approach to the car and illuminating its front interior was not "for purposes of investigating possibly criminal behavior." Nevertheless, he did not see or seize anything incriminatory.

(1972) and *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the State requires that the formulation be addressed.

At the outset it is observed that the "stop and frisk doctrine" is constrained by "the stricter *Terry* standards," that is, standards more strict than those "traditionally governing a search incident to lawful arrest," *United States v. Robinson*, supra, 414 U.S. at 234, 94 S.Ct. at 476; *Gustafson v. Florida*, supra, 414 U.S. at 264, 94 S.Ct. 488. While much has been lifted by other judicial opinions from earlier sections of the decision of *Terry v. Ohio*, the precise holding comes at the end of a thirty page discussion, 392 U.S. at 30, 88 S.Ct. at 1884–85:

"We conclude that the revolver seized from Terry was properly admitted in evidence against him. At the time he seized petitioner and searched him for weapons, Officer McFadden had reasonable grounds to believe that petitioner was armed and dangerous, and it was necessary for the protection of himself and others to take swift measures to discover the true facts and neutralize the threat of harm if it materialized. . . . Each case of this sort will, of course, have to be decided on its own facts. We merely *hold* today that where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous, where in the course of investigating this behavior he identifies himself as a policeman and makes reasonable inquiries, and where nothing in the initial stages of the encounter serves to dispel his reasonable fear for his own or other's safety, he is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him."

Decided the same day, *Sibron v. New York*, 392 U.S. 40, 64, 88 S.Ct. 1889, 1903, 20 L.Ed.2d 917 (1968), restates and applies the *Terry* holding:

". . . The police officer is not entitled to seize and search every person whom he sees on the street or of whom he makes inquiries. Before he places a hand on the person of a citizen in search of anything, he must have constitutionally adequate, reasonable grounds for doing so. In the case of the self-protective search for weapons, he must be able to point to particular facts from which he reasonably inferred that the individual was armed and dangerous."

Personal observations that the officer articulated in *Terry* were enough to justify his actions. In *Sibron* they did not measure up. The officer in *Adams v. Williams*, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972) properly acted on a tip from a known informant that Williams was seated in a nearby car carrying narcotics and had a gun at his waist. The officer who ordered Mimms from his car in *Pennsylvania v. Mimms*, 434 U.S. 106, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977) noticed "a large bulge" under the sport jacket Mimms was wearing as he alighted from his car; this, opined the Supreme Court, "permitted the officer to conclude that Mimms was armed and thus posed a serious and present danger to the safety of the officer," 434 U.S. at 112, 98 S.Ct. at 334. On the other hand, less than two months ago in *Ybarra v. Illinois*, —— U.S. ——, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979) the Supreme Court rejected a frisk of a patron in a bar being raided pursuant to a search warrant for heroin on the premises because, "The initial frisk of Ybarra was simply not supported by reasonable belief that he was armed and presently dangerous, a belief which this Court has invariably held must form the predicate of a patdown of a person for weapons." The Supreme Court further explained that *Terry* permits an officer to pat-down "to find weapons that he reasonably believes or suspects are *then in the possession* of the person he has accosted," and emphasized:

". . . . Nothing in *Terry* can be understood to allow a generalized 'curso-

ry search for weapons' or, indeed, any search whatever for anything but weapons."

■ Every "stop and frisk" opinion of the Supreme Court from *Terry* through *Ybarra* thus makes crystal clear that the pat-down of outer clothing for weapons must be based on a reasonable belief from articulable facts and circumstances that the suspect at that moment has on his person a weapon. We have not been cited to nor have we found a decision of the Supreme Court that upheld a frisk of the person of an individual on the strength of a belief that he knew of the presence of a weapon somewhere else.[14]

■ Given the propensity of many citizens of this State to carry about in their motor vehicles otherwise legal firearms— the incidence increase depending on the season—we are not prepared to say that merely sighting a shotgun in the floorboard area of a car whose driver is stopped for excessive speed is sufficient justification under the *Terry* standards to conduct a frisk of the driver who is standing well away from his car in the charge of another officer. Possession of the shotgun is not an offense. Presumptively, then, its presence in the car was for a legal purpose. Without other articulable facts and circumstances giving rise to a reasonable belief that appellant was carrying a weapon on his person and was dangerous, the *Terry* gambit never came into play, and the frisk and search of appellant were not authorized.

■ However, our decision does not end here. There must still be determined admissibility of the remaining items discovered in the car during impoundment, inventory[15] and execution of a valid search warrant.[16] Constitutional dogma holds that when the connection between unconstitutional police conduct and incriminating evidence thereafter obtained is sufficiently attenuated the latter may still be used at trial. See *Dunaway v. New York,* —— U.S. ——, at ——, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979). Otherwise stated, the relevant inquiry is whether the materials seized from appellant's car were obtained by exploitation of the illegal frisk, cf. *Brown v. Illinois,* 422 U.S. 590 at 600, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975); see *Wong Sun v. United States,* 371 U.S. 471 at 488, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). Clearly, the answer is that they were not and, consonantly, the connection, if not completely broken, was sufficiently attenuated.

Once appellant "broke and ran" as soon as the matchbox was taken from his pocket and examined by the officers, he committed the offense of escape denounced by V.T.C.A. Penal Code, § 38.07 and, in the vernacular, started a whole new ballgame. Appellant argues that "but for" discovery of the white powder in the matchbox, the officers would not have searched appellant's car, but we are not cited to any record references where evidence may be found to support the argument. There is no doubt at all that once appellant was captured, the officers had little choice but to impound his car and they appear to be justified in inventorying its contents. The affidavit for search warrant rests probable cause on an unidentified informant; appellant does not contend it is legally insufficient in that respect;

---

14. Indeed, the practice of ordering a driver out of his vehicle as a matter of course, a measure adopted to afford a degree of protection to the officer, was identified in *Pennsylvania v. Mimms,* supra, as the very state interest that outweighed the "petty indignity" to the driver: "Establishing a face-to-face confrontation diminishes the possibility, otherwise substantial, that the driver can make unobserved movements; this, in turn, reduces the likelihood that the officer will be the victim of an assault," *id.* 434 U.S. at 110, 98 S.Ct. at 333.

15. Taken then and later admitted in evidence were the shotgun, its six shells, a box of shotgun shells and six syringes.

16. Seized during the warrant authorized search and admitted in evidence were packets of over 80% pure methamphetamine, a small container of marihuana and papers containing the chemical formula for manufacture of methamphetamine.

we have no basis for even suggesting that the informant was someone who was exploiting the initial frisk. Both the methamphetamine and marihuana were found in and removed from the trunk of the car. There is nothing we have found in this record that relates, certainly that connects, discovery of the small matchbox containing .63 grams of 90% pure methamphetamine in his pocket with the packets of a much larger quantity of something near 80% methamphetamine in the trunk of his car.

■ Therefore, with respect to admitting the exhibits taken during the inventory and seized from the trunk of the car under a valid search warrant, there was no error. The latter larger quantity of methamphetamine being the basis of the indictment, trial and conviction, evidence of appellant's guilt is overwhelming.[17] Admission of the matchbox, then, was harmless error beyond any doubt, *Harrington v. California*, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969). There is not a reasonable possibility that evidence of the contents of the matchbox might have contributed to the *conviction, Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). As to punishment, cf. *Jordan v. State*, 576 S.W.2d 825, 830 (Tex.Cr.App.1978), upon finding appellant had been twice convicted of prior felonies, the jury discharged its function on punishment and mandatory life was statutorily assessed; thus, inadmissible evidence hardly contributed to determining punishment.

Appellant's motion for rehearing is granted in part, his ground of error three is partially sustained; but that portion of the motion seeking reversal and remand is denied.

DOUGLAS and DALLY, JJ., concur in result.

---

17. In this circumstantial evidence case, the sufficiency of which is not challenged here, that appellant possessed the methamphetamine found in the trunk of his car is not opposed by any other reasonable hypothesis.